May Term, 1855.

STEWART
v.
ENGLISH.

---

### STEWART and Others *v.* ENGLISH and Others.

Fraud is never presumed, but must be clearly proved by the party charging it; the presumption being always against bad faith.

Under the R. S. 1843, the question of fraudulent intent was a question of fact and not of law.

In a suit to set aside a conveyance as fraudulent against creditors, it must be shown that the vendee received the conveyance with a fraudulent intent.

The fact that the vendee knew, at the time of the conveyance, that a suit was pending against the debtor to recover judgment for the debt, is not of itself proof of such fraudulent intent.

The law does not prohibit a debtor, in failing circumstances, from making an assignment of his property, with a view of paying his debts, provided he does so for a full consideration and without a fraudulent intent.

The inquiry, in a suit to set aside such a conveyance, should always be, whether the act done was a *bona fide* transaction or a mere trick or contrivance to defeat creditors.

Chancery has no power, in any case, to appropriate choses in action to the payment of a judgment at law.

Tuesday, May 29.

ERROR to the *Wabash* Circuit Court.

DAVISON, J.—Bill in chancery. The object of this suit was to reach certain property alleged to have been transferred by *Robert English*, with the intent to hinder and delay the plaintiffs from the collection of a judgment at

law. The material facts, as they appear by the bill of complaint, answers, exhibits and depositions, are these:

In *July*, 1849, *English* bought of the plaintiffs, then merchants in the city of *New-York*, a stock of goods worth 8,780 dollars, for which he executed to them his promissory note, payable in six months. When this note was given, it was verbally agreed between the parties, that they were to wait on him for payment twelve months. He, also, in that month, gave them another note for 413 dollars, payable within sixty days, at the branch bank at ·Fort-Wayne. This note he failed to pay. And in *January*, 1850, about the time the larger note matured, one of the plaintiffs called on *English* at *Lagro, Indiana*, his place of residence, for security on their claim. It was then proposed to extend the time of payment of the notes, provided *English* would give a mortgage on all his real estate. This proposition was accepted; but on application to *English's* wife, she refused to sign the mortgage, and the arrangement was not carried out. Thereupon the notes were placed in the hands of an attorney. On the 13th of *January*, 1850, suit was brought on these notes against *English* in the *Wabash* Circuit Court. On the 20th of said month, process in the cause was served, and on the 20th of the next *March*, the plaintiffs recovered a judgment in said Court against him for 9,291 dollars. Between the commencement of the suit and the judgment, *Donovan* visited *English* at *Lagro*, and, at his solicitation, proposed to loan him a sum of money to pay on the plaintiffs' notes, whereby he might be enabled to procure an extension of payment for the residue. About the 1st of *February*, 1850, they proceeded together to *Fort-Wayne*, where the plaintiffs' attorney resided, and remained at that place three days, during which *English* made an effort to obtain an extension of the debt sued on, but having failed to make any such arrangement, they returned to *Lagro*. After this, in *February*, 1850, *English* sold and conveyed to *Donovan* real property worth 4,649 dollars, and also sold and delivered to him merchandise valued at 11,472 dollars—making a total of 16,121 dollars; and within the same month *En-*

*glish* sold and conveyed to the said *Roche* a tract of land for 1,800 dollars. The terms of the sale to *Donovan* were 1,500 dollars down, and for the balance he executed his notes, without interest and without security, at twelve, eighteen and twenty-four months. *Roche*, for the land which he purchased, gave his notes upon a similar credit. These sales were at full value. Prior to the 23d of *February*, 1850, *Donovan* removed the merchandise to his place of residence in *Pike* county, and at that date the several deeds to him and *Roche* were duly recorded.

At this period, *English* was largely indebted, was to some extent embarrassed; but his property, at its fair value, was sufficient to pay all his debts. From the evidence, it may be inferred that *Donovan* and *Roche* knew that he was indebted; but there is nothing tending to show that they were at all acquainted with the extent of his liabilities. They had knowledge of the plaintiffs' suit; but *English* had other property, not transferred, more than enough, at its real value, to satisfy any recovery that might be the result of that suit.

The weight of evidence induces the conclusion that *English*, by these sales, intended to raise means to pay all his debts as speedily as possible. We perceive nothing in the record amounting to proof that either *Donovan* or *Roche* knew, believed, or even suspected that *English* intended to delay, hinder, or defraud the plaintiffs.

*English*, on the 12th of *March*, 1850, executed to *Pettit*, one of the defendants, a deed of trust, whereby he transferred to him for the use of his (*English's*) creditors, the plaintiffs included, choses in action worth, on their face, 18,000 dollars. The notes given by *Donovan* and *Roche* constituted a part of that amount. Also, for the same purpose, he assigned to *Pettit* certain real and personal property, the value of which is not shown, but which appears to have been disposed of by him before this suit was instituted. In the deed of trust, *English* designated certain preferred creditors. The plaintiffs were not named in that class, though the deed provides for the payment of their demand. He also reserved the right of securing and

preferring creditors at home, for small amounts, at any time within six months from the date of the deed. By this deed, it appears that *English* was divested of title to all his property, which, it is shown, was sufficient to cover all his indebtedness existing at the time of the transfer to his trustee.

On the 1st of *April*, 1850, the plaintiffs sued out a writ of *fieri facias* on their judgment against *English*, which was levied on certain lands as his property. This levy embraced all the lands conveyed by him to *Donovan*. They were afterwards sold by the sheriff to the plaintiffs for 397 dollars, and, on payment of that sum, they received a deed pursuant to the sale. The sheriff, on the 13th of *August*, 1850, made return of said writ, to the effect that he had applied the 397 dollars in payment of a prior execution in favor of *Lyman, Seers & Co.;* that the plaintiffs' execution remained wholly unsatisfied, and, as to it, he returned the same *nulla bona.*

When this suit was brought, *English* was a non-resident. He was notified by publication, and having failed to appear, was defaulted. The other defendants, *Donovan, Roche* and *Pettit*, answered the bill.

The bill prays that the respective deeds executed to *Donovan, Roche* and *Pettit* be declared fraudulent and void, as to the plaintiffs' judgment; that the title to the real estate sold and conveyed to them by the sheriff be confirmed; that the payment of said judgment be decreed; and that the defendants be held to account for all the real and personal property, money and choses in action by them, or either of them, received from *English;* that a receiver be appointed, &c.; that an injunction be awarded, &c.; and for general relief.

Upon a final hearing, the Circuit Court dismissed the bill.

It is a settled rule of law that fraud is never presumed; it must be clearly proved by the party making the charge, for the presumption of law is always against bad faith. *Burr* on Assets 397. It is true, a deed, where it contains "provisions in direct conflict with some established rule or requisite of law," may be deemed void. That principle,

however, does not apply to the deeds executed to *Donovan* and *Roche*, because, on their face, they wear no illegal aspect. They are in the ordinary form. Hence, they can not be adjudged fraudulent, unless facts requisite to prove them so can be deduced from extrinsic circumstances. It must be shown that the transfers from *English* to them were received with an intent to aid him in the commission of a fraud, for, without such intent, there can be no fraud on their part; and under our statute, that intent is a question of fact and not of law (1). R. S. 1843, p. 592.— *Hubbs* v. *Bancroft*, 4 Ind. R. 388.

We are to inquire, then, whether there are any evidences of fraud attending these transfers, which vitiate them. It is said that the vendees knew of the plaintiffs' suit against *English*, and that such knowledge is a circumstance which weighs against the purity of the transaction. We are not of that opinion. *English* may have feared that the suit would result in a sacrifice of his property. He was so advised by the plaintiffs' counsel. The suit may have directed his attention to his other creditors, and prompted him to dispose of his property, that he might be able to do justice to all of them. All this may be inferred from the evidence. Still there is no proof that *Donovan* or *Roche* was, in any degree, acquainted with even that purpose. The mere fact that a suit was pending, afforded, of itself, no proof of fraud on the part of *English*, for a debtor may assign his property after, as well as before, action brought. *Burr* on Assets 76.

Nor does the law prohibit a man in failing circumstances from making such assignments, in view of paying his debts, provided he does so upon full consideration and without a fraudulent intent. But the circumstance that *Donovan* and *Roche* knew of the pending suit is of slight importance, when we look into the whole transaction. *English* sold them only a part of his property; enough remained unsold to satisfy the plaintiffs' demand. None of his creditors, save the plaintiffs, were pressing him. Nor does it appear that his vendees were apprised that he had other creditors.

May Term, 1855.

STEWART v. ENGLISH.

That the consideration of these sales was full and adequate, is not denied; but it is said that the length of credit, without interest and without security, are circumstances which render the transaction suspicious. The force of this position is not perceived. The amount involved in the purchase considered, there is nothing in the extended time of payment without the scope of an ordinary sale. Nor is it at all unusual to sell property upon credit, and without interest on the purchase-money. These stipulations were involved in the contract, and were as much a part of it as the making of the deeds or the delivery of the property. If the vendees had been men of limited means, unable to meet their engagements, there would be some force in the objection that security on the notes was not required; but that state of case does not accord with the proofs. They were men of sufficient means, and their ability to discharge their notes as they matured could not be questioned. Indeed we perceive nothing in the record that tends to show that the sales in question resulted from any impure motive, either in the vendor or purchaser.

Again, it is said that the sales were made with the intent to hinder and delay the plaintiffs; that *Donovan* and *Roche* had notice of that intent; and that such intent implies fraud. This view is not supported by the record. We have seen that these sales did not divest *English* of all his property; that enough remained unsold to answer the plaintiffs' demand. It could not, therefore, be inferred from the transaction itself that *English* intended hindrance or delay; nor is there any other point in the evidence tending to prove that his vendees had notice of such intention. The transfers may have had the effect of hindering or delaying the plaintiffs; but was that the purpose for which the assignments were made? The law permits a debtor, even in failing circumstances, to dispose of his property for the benefit of his creditors; and when such honest intention predominates, the mere effect of the act can not be considered unlawful. Any other construction of the statute of frauds, would disaffirm every assignment by an

insolvent of all his property in trust for his creditors, because its necessary effect is to hinder or delay. It seems to us that the inquiry, in cases like the present, should always be, "whether the act done is a *bona fide* transaction, or whether it is a trick or contrivance to defeat creditors." *Cadogan* v. *Kennet*, 1 Cowp. 432.—*The United States* v. *Hooe*, 3 Cranch 73.—1 Story Eq. Jur., s. 353. We think that *English*, whatever the effect of his course may have been, intended to render full justice to all his creditors, so far as the means within his power would enable him to produce that result.

When this suit was commenced, the property in *Pettit's* hands consisted of choses in action. These the bill seeks to appropriate to the payment of the judgment. Hence, the inquiry results, has a Court of Equity power to grant this species of relief? The plaintiffs assume the ground that "a creditor, having pursued his remedy at law to judgment and execution, may go into equity, and compel discovery and appropriation of his debtor's property, in whosesoever hands it has been placed out of the reach of execution at law, and that it makes no difference whether such property consists of choses in action, money or stocks." In support of this position, *Hadden* v. *Spader*, 20 Johns. 554, is cited; but that case, it is believed, does not accord with the weight of authority on the subject. The doctrine relied on evidently applies where a trustee holds property which would have been tangible by execution, and which he has received under circumstances which show fraud as against creditors. Choses in action, however, are not subject to execution, and consequently not within chancery jurisdiction. But with us, this is no longer an open question. *Shaw* v. *Aveline*, 5 Ind. R. 380, expressly decides that chancery has no power, in any case, to appropriate choses in action to the payment of a judgment at law. That case was decided after a full consideration of the authorities bearing on the point, and we must, therefore, regard it as a rule of decision in this Court.

The evidence in the cause does not produce in our minds the conclusion that the deed to *Pettit* is void; but if it did,

the view just taken would supersede the inquiry whether it was so or not, because if the deed was set aside, the plaintiffs would not be benefited, as no process of execution, in law or equity, can reach the choses in action. If, as appears by the record, *Donovan*, at the time this suit was instituted, was a non-resident, all its objects might have been legally attained by the simple process of attachment. R. S. 1843, c. 41, art. 1, 2.

Upon the whole, we think the plaintiffs have not made such a case as entitles them to relief in a Court of equity.

STUART, J., having been concerned as counsel, was absent.

*Per Curiam.*—The decree is affirmed with costs.

*J. K. Edgerton* and *C. Case*, for the plaintiffs.

*W. Z. Stuart* and *D. D. Pratt*, for the defendants.

(1) The statute of 1852 is similar. 1 R. S. 1852, p. 303.